```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF WASHINGTON
 2
    ---------------------------
 3  UNITED STATES OF AMERICA, :        ORIGINAL

 4                           :  Criminal No.
                Plaintiff,   :  4:23-MJ-189
 5                           :
          vs.                :
 6  RYAN C. KELLY,           :   TRANSCRIPTION OF
                             :   AUDIOTAPE of
 7              Defendant.   :   Detention Hearing
    ------------------------     April 24, 2023
 8

 9

10

11  BEFORE:  THE HONORABLE MARY ALICE THEILER

12

13  APPEARANCES:

14  For the Plaintiff:

15

16                  ELYNE VAUGHT
                    Assistant U.S. Attorney
17                  700 Stewart Street, Suite 5220
                    Seattle, WA 98101-1271
18
    For the Defendant:
19

20                  DENNIS CARROLL
                    Assistant Federal Public Defender
21                  1601 Fifth Avenue, Suite 700
                    Seattle, WA 98101
22

23

24      Lee Ann Eaton - Certified Shorthand Reporter

25
```

```
 1                  P R O C E E D I N G S

 2            THE COURT:  Good afternoon.  Please be

 3   seated.  And wouldn't you know it, there are no pens

 4   up here.  Oh, here we go.  I've got one.

 5            So this is Case Number MJ23-189, United

 6   States versus Ryan Kelly.  Let's take appearances.

 7   We'll start with the United States.

 8            MR. VAUGHT:  Good afternoon, Your Honor.

 9   Elyne Vaught here on behalf of the Government.

10            THE COURT:  Good afternoon.  For the

11   defendant?

12            MR. CARROLL:  Good afternoon, Your Honor.

13   Dennis Carroll on behalf of Mr. Kelly.

14            THE COURT:  Okay.  Good afternoon.  So,

15   Mr. Kelly, you're here because a case was filed in a

16   different district than this, the District of Iowa,

17   I believe it is, in which you're charged with an

18   offense -- you're named as the defendant -- Southern

19   District of Iowa.

20            Because this is a different district than

21   that, you have the right to have a hearing to

22   determine if you are the person named in that case

23   as the defendant.  You could waive that right, but

24   if you did, then -- or whether or not you did, if

25   you were found to be that individual, you would be
```

1    transferred to the Southern District of Iowa to

2    address the charges.

3            First of all, though, we have scheduled a

4    hearing today to determine what your release status

5    would be if you would be released on an appearance

6    bond or remain in custody pending your appearance in

7    the Southern District of Iowa.

8            So the Government did file a Motion for

9    Detention.  I have a report from pretrial services

10   that supplements the report filed initially.  Their

11   recommendation is that Mr. Kelly be released on

12   conditions.

13           What is the position of the United States?

14           MR. VAUGHT:  Thank you, Your Honor.  The

15   position of the United States, Your Honor, is that

16   Mr. Kelly remain detained pending transfer to the

17   Southern District of Iowa.  And the reasons for that

18   position, Your Honor, are the following:  One, or

19   two, the Government does have concerns, and I

20   believe it's also some concerns that are shared in

21   the pretrial services report that Mr. Kelly

22   presents, one, a flight risk, but also a danger to

23   the community.  Where we differ is on the issue of

24   conditions that could reasonably assure or mitigate

25   these concerns or these risks that the Government

1   has.

2          When it comes to the flight risk, Your

3   Honor, I'll touch briefly on that.  As the Court has

4   already alluded to, he has been charged in the

5   Southern District of Iowa with the charge within the

6   complaint, with one count of interstate transmission

7   of a threat, that threat being directed to the

8   governor of that state.

9          In addition to that and as outlined in the

10  pretrial services report, there are indications of

11  some mental health issues, and I won't go too deep

12  into that because I am not a doctor, but there are

13  some indications that he may be suffering from

14  bipolar disorder and some other underlying mental

15  health issues.

16         That concern coupled with the fact that

17  his employment appears to be unstable at this point

18  in time -- it's unclear if he's currently employed

19  or not, and so the concern from the Government's

20  standpoint is if he is released today, how would he

21  make his way over to the Southern District of Iowa

22  to address these charges, given sort of the mental

23  health conditions as well as his employment and

24  economic sort of situation?

25         But moving on to the sort of next concern

1    from the Government, and that comes in the

2    perspective or from the perspective that Mr. Kelly

3    presents a danger to the community, and I'm sure the

4    Court has read the underlying allegations in the

5    complaint that was filed out of that district.

6    There were two threats that were made on April 18th

7    of this year, and those threats were recorded.  And

8    I'm not going to repeat them verbatim for the Court,

9    but those threats were directed towards the Governor

10   of Iowa.

11          FBI agents, I believe, on April 24th

12   conducted a search warrant, arrested Mr. Kelly, and

13   Mr. Kelly confessed to these threats being made.

14   There's no indication that he's made these threats

15   in jest or jokingly.  By all appearances, based off

16   of what we have today, is that these threats were

17   serious and that these threats were directed at the

18   governor's office and wishing simply the governor to

19   change her mind on a specific piece of legislation.

20          But that doesn't stop there, Your Honor.

21   I have shared with probation as well as defense

22   counsel sort of a history of threats that Mr. Kelly

23   has done in the past, and I'll start with 2020 with

24   a report out of Anacortes.  In that case, there was

25   a threat that was made to beat up an employee of a

1    Montessori school in which the defendant's

2    girlfriend had worked at.  She had been fired

3    because of or due to COVID, and I believe that upset

4    Mr. Kelly.  And so he called that number or called

5    that school and threatened to cause harm to the

6    person who fired his girlfriend.  And I want to note

7    that girlfriend is Megan Leeder (phonetic), who is

8    also noted in the pretrial services report in which

9    they are asking for him to be released to.

10            But it didn't stop there.  There was

11   another threat that was sort of -- that came about

12   in 2021, and that came out of Burlington of this

13   state;, and that threat was made to burn down a

14   Target with people in it, a Target store, because he

15   had applied to a job there.  He didn't get the job,

16   was upset he didn't get the job and made the threat

17   to burn down the store and everyone in it.  They

18   took those threats seriously, reported it to law

19   enforcement, and that case was noted.

20            There was another one, Your Honor, just

21   last year, 2022.  In 2022 an office called M1

22   Finance in Chicago, Illinois, filed a cyber tip or

23   cyber -- yeah, cyber tip online with the FBI

24   indicating that they received a threat to their CEO,

25   more specifically, that someone made a threat to

1    murder their CEO and people in that office.  That

2    office took that threat seriously.  They closed down

3    for about two days.

4                Further examination and investigation in

5    that case revealed that an email that was used to

6    send that threat came back to Mr. Kelly, and that,

7    furthermore, IP searches and addresses came back to

8    a location in Concrete, Washington, the very same

9    location where Mr. Kelly was residing.

10               THE COURT:  So these incidents that you

11   mentioned, I don't know that I heard about the last

12   one, but are in the supplemental report referenced,

13   and there were no charges filed?

14               MR. VAUGHT:  And that's correct.  I don't

15   know what the procedural history or posture of like

16   the Burlington case, the Anacortes case or even this

17   last one I was discussing, but I do note that there

18   are no -- there were no charges, and I don't know

19   the underlying reasons behind that.

20               So what we have here, Your Honor -- and

21   also in addition to not just his history of threats

22   that I just mentioned, I also kind of looked through

23   the pretrial services report and compared and

24   contrasted it to, you know, the initial interview he

25   did to the one that was submitted today, and for the

1    most part, they line up.  But there is one concern

2    to the Government, and that concern was really when

3    -- I believe April 24th, when Mr. Kelly was

4    initially interviewed, he indicated that there were

5    no firearms in the house.  And then the supplemental

6    that was filed today, the person who owns the home

7    to whom Mr. Kelly is asking to go back to indicated

8    through an interview that there is a firearm in the

9    house.  It's just separated into two parts and

10   placed in position differently in the house.

11          So I just have some concerns there,

12   Your Honor, and it really goes to, you know, whether

13   or not Mr. Kelly is being forthright in some of his

14   responses to pretrial services or not.

15          So all of this kind of goes towards my

16   concern or the Government's concern about the danger

17   that Mr. Kelly poses.  What we see here is an

18   escalation of behavior for such a person of such a

19   young age, and this escalated from just a threat --

20   not just a threat, but a threat of harm to

21   individuals at a store or school to the point where

22   now the threat is being directed towards the highest

23   elected official within the State of Iowa.

24          THE COURT:  So let me just ask you about

25   the -- first about the firearm.  So that apparently

1   was owned by the individual that owns the house, I

2   guess, where they live, Mr. Young.

3             Does Mr. Young live there too?

4             MR. CARROLL:  Yes.

5             THE COURT:  Mr. Carroll said yes.  All

6   right.  And when you say it's escalating, I mean,

7   these types of alleged incidents, actually it seems

8   like he does have perhaps a history of those types

9   of threats, but other than the fact that this latest

10  one is directed against the governor of a state, why

11  would you characterize those as escalating?  I mean,

12  it seems like it's -- if we accept, you know, for

13  purposes of my point that these have happened, isn't

14  it just a pattern of similar sorts of things?  Would

15  you really say it's escalating?

16            MR. VAUGHT:  I guess I used the term sort

17  of out of place.  Yes, they are similar patterns.

18  This is a pattern and practice that Mr. Kelly has

19  used for a number of years, and I guess what I mean

20  by "escalation," not necessarily escalation, but in

21  regards to the sort of intended targets of the

22  threat --

23            THE COURT:  Higher profile, maybe?

24            MR. VAUGHT:  Higher profile and more bold,

25  et cetera, of who he's targeting.  So escalation is

1   probably not the right term.  It's more of this is a

2   pattern and practice, but now what we're seeing here

3   is that he's directing these threats to a much

4   more -- not just higher-profile person, but a person

5   who he knows that his threats are going to be heard.

6            THE COURT:  Uh-huh.  Bolder.  Okay.  All

7   right.  I see the point.  Thank you.

8            MR. VAUGHT:  And that's all, Your Honor,

9   and I would ask the Court to detain Mr. Kelly

10  pending the transfer to the Southern District of

11  Iowa.  Thank you.

12           THE COURT:  Thank you.  Mr. Carroll.

13           MR. CARROLL:  Thank you, Your Honor.

14  We're asking for release with the conditions

15  recommended by pretrial services.  I think -- I can

16  say I've talked to his parents, and I have talked to

17  his roommate, Aaron, probably three times in the

18  last few days.  They are all very supportive of him.

19  They all note that he is not overtly violent or he's

20  not physical with any other people.  None of them

21  believe that he would actually pose a risk of

22  carrying out any act of violence.

23           Mr. Kelly is 34 years old with extremely

24  limited criminal history, and I'm going to go

25  through his history and some other factors.  But

1  just in terms of framing this, this is a situation

2  where there is a very strong presumption in favor of

3  release, and, in fact, under the Bailey format, I

4  would question perhaps if the Government has kind of

5  met some of its burden today by coming forward with

6  some reports that they provided this morning, but

7  this is not a crime for which a detention hearing is

8  automatically warranted.  The Government has asked

9  for a detention hearing under 3142(f)(2), checking

10  the box for a serious risk of flight, which,

11  frankly, I'm just not sure I see the basis for a

12  risk of flight here.

13          And in terms of danger, under 3142(f)(2),

14  the Government has to show, just to get a detention

15  hearing, by clear and convincing evidence that the

16  case involves a serious risk that such a person will

17  obstruct or attempt to obstruct justice, threaten,

18  injure, or intimidate or attempt to threaten,

19  injure, or intimidate a prospective witness or

20  jury -- or juror.  So that's someone -- that's a

21  very specific type of risk that's really not in

22  place here.

23          Here we have someone who is -- again, very

24  limited criminal history, no felony history.  Last

25  conviction for obstruction of justice was back in

1    2016.  Looking at these police reports, it looks

2    like there has been one incident a year.  If you

3    take at face value that Mr. Kelly was the person in

4    each of these reports, I would note, as the Court

5    did, that none of them were ever even charged.

6              None of them suggest like kind of a

7    stalking-type behavior, which is much more alarming.

8    These appear to be a one-off types of things.  He

9    didn't get the job at Target, and on the way out, he

10   yelled something to someone who was gathering up

11   grocery carts.  And the school thing was not like

12   repeated phone calls.  It was allegedly just one

13   phone call where he was supposedly upset that his

14   fiancée was not able to get unemployment or continue

15   to work during the COVID lockdown.

16             Regarding the M1 Finance one that was just

17   provided, that was July 2022.  Mr. Kelly told me he

18   has really no idea about that at all because he's

19   not somebody -- he gets disability.  I don't know

20   why he would be trying to communicate with a tech

21   finance company.

22             So, again, this is a person with a stable

23   address over the past four years.  He has a

24   supportive partner, a supportive housemate.  They

25   kind of live as a collective.  They are willing to

1    help him comply with conditions as well as to get to

2    court in Iowa.

3              The current offense or allegations, the

4    Government has a strong case, but that is the least

5    important factor in this Court's analysis.  However,

6    there's no indication at all that there was ever any

7    attempt to carry out this threat.  This is not the

8    sort of case where there's also evidence that the

9    defendant is making travel plans.  In fact, the

10   evidence is that he's super anxious about traveling.

11   Traveling is kind of difficult for him.

12             THE DEFENDANT:  I don't even have a

13   license.  Sorry.

14             MR. CARROLL:  So it's not a situation

15   where he was making plans to go to Iowa to go see

16   the governor or something like that or collecting

17   weapons or anything of that nature.

18             THE COURT:  So can I just ask you some

19   questions?  Because I am not sure I totally have a

20   grasp on his situation just yet.  So his parents

21   live in New York, and he is 34 years old, I believe

22   it was said.  And everyone has referred to the fact

23   that he's on disability.  Is that Social Security

24   Disability?

25             MR. CARROLL:  Yes.

1              THE COURT:  And what is he on disability

2      for and how long?

3              MR. CARROLL:  He reports autism and ADHD,

4      and that's corroborated by, I think, the

5      conversation with the parents.

6              THE COURT:  Okay.  And he was getting

7      disability for that?  He was receiving it because

8      he's disabled due to ADHD and --

9              MR. CARROLL:  Autism.

10             THE COURT:  -- autism.  So is he -- and

11     he's moved out of the home, his parents' home, what,

12     like ten years ago or something?

13             MR. CARROLL:  Some time ago, yes.

14             THE COURT:  And he lived in a bunch of

15     different places, Alabama, all over the country.

16             MR. CARROLL:  Yes, until 2018 or so it

17     looks like he and his fiancée were moving around,

18     between his parents' home and then moving away and

19     then back.

20             THE COURT:  North Carolina, Arizona and

21     Florida.  And it does seem that, you know, he's had

22     issues, at least alleged -- either charges,

23     convictions, maybe just charges and nothing else in

24     those other locales of various types.  If you see --

25     if you look at his adult record, there's one in

 1   New York, but dismissed.  There was one in --

 2   another New York.  There was a fine, unknown

 3   disposition.  And in Alabama, either failure to

 4   appear, controlled substances, various different

 5   things every few years.  There's Florida, North

 6   Carolina.  But what I'm wondering is, so what is he

 7   doing in those places?  He's not working, I assume.

 8   When did he get disability?

 9            MR. CARROLL:  I don't recall exactly when

10   he started getting disability.  It's my

11   understanding it was relatively recent or --

12            THE DEFENDANT:  No.  Can I speak?

13            THE COURT:  Yes.  Well, just to that

14   one --

15            THE DEFENDANT:  I've gotten disability for

16   at least the last ten years.

17            THE COURT:  Okay.

18            THE DEFENDANT:  I was diagnosed very

19   early.

20            THE COURT:  Where were you living when you

21   got your award?

22            THE DEFENDANT:  I was living in New York

23   with my parents.

24            THE COURT:  All right.  So he has been on

25   disability and hasn't been working, I assume,

1   although there was something about -- I forget what

2   it was, landscaping or something.

3            MR. CARROLL:  I think it was DoorDash or

4   something like that.

5            THE COURT:  Or DoorDash.  So has he gotten

6   any treatment for any of these conditions?

7            MR. CARROLL:  It's my understanding that

8   he's not currently in treatment.

9            THE COURT:  I mean, it's not an easy task

10  to get Social Security Disability for a relatively

11  young person for ADHD and autism.  So he must be

12  pretty disabled by it.  I'm just wondering, is

13  anything being done for that?  I mean --

14           THE DEFENDANT:  I can't afford it.

15           THE COURT:  Well, it's paid for by Social

16  Security.  Well, you get Medicare.

17           THE DEFENDANT:  The Medicare Part B had to

18  be let go so I could afford my rent.  I did a state

19  buy-in three years ago.

20           MR. CARROLL:  That's what I was going to

21  say, Your Honor.  But I would suggest that with

22  conditions, he would comply with any mental health

23  condition the Court imposes under the supervision of

24  some mental health professional.  We have no

25  objection to the condition recommended by pretrial

1     services.

2            I just don't see his -- his criminal

3     history is -- in the scheme of things of cases that

4     come before this Court, is pretty light and pretty

5     dated, going back to the most recent charge or

6     conviction, I think, was 2016.  So it has been a

7     while.

8            THE COURT:  It's not exactly the same as

9     what he's being charged with now.

10            MR. CARROLL:  Correct.

11            THE COURT:  Although there are these other

12     incidents that the Government mentioned, which

13     are -- but no charges resulted, but nevertheless,

14     here's what I'm concerned about:  It doesn't seem

15     that he has a history of acting on the threats, but

16     the threats themselves are very specific and

17     terrifying.  So if one of the -- I think the

18     parents, one of the parents said he has this pattern

19     of it kind of builds up, and then he does -- his

20     mother said her son holds things in until it comes

21     out in an explosion and actually associates with

22     autism, but he has never been physical or acted on

23     anything he has said.

24            Okay.  That appears to be true, that he

25     hasn't acted out or done anything physical, but the

1    threats are -- and actually, I think there is

2    something to say.  It was a bit bolder where he's

3    calling the Governor of the State of Iowa.  So it's

4    impulsive, explosive, and, you know, how much -- how

5    far is it until there is some action on that?  I

6    don't know.  It just seems as though he's got some

7    serious mental health challenges and needs

8    treatment.  So I don't think confining him is the

9    answer either, given what the allegations are and

10   that he has no violent history whatsoever.

11          So I think he should -- I don't mean to

12   cut you off, but I think he should be released on

13   the conditions.  I just want to make sure that some

14   kind of mental health monitoring, close monitoring

15   and treatment is part of it, and I think he should

16   be on electronic monitoring too for now anyway,

17   because this is a case in a different district.  I

18   don't know what that district is going to do about

19   that case.

20          But, yeah, that's pretty high-profile, and

21   it does seem bolder than what his previous alleged

22   actions are.  Not that he ever was charged with it,

23   so we can't really rely on it, but I'm just trying

24   to think, what are the conditions that would allow

25   him to be released?

1              By the way, addressing the point you were

2    making about he doesn't pose a risk of danger and

3    that we don't even meet the threshold for detention,

4    I think given what I said about the threats, you

5    know, are pretty specific and frightening, there is

6    enough there to find that -- at least on a prima

7    facie level, I think I could make a finding that

8    there's enough for a -- for this to be a potential

9    detainable offense.

10             But I do think he should be released with

11   the -- okay.  The drug testing, although that bit

12   misses the mark, I think the call we need here is

13   for mental health monitoring and treatment, because

14   there isn't any indication of really heavy drug use

15   here.  Is that right?  Maybe marijuana.

16             MR. CARROLL:  I believe he has used

17   marijuana to some extent.

18             THE COURT:  And he won't be able to do

19   that.  I'm sure that can't be helping.  So his

20   travel will also be restricted to this district or

21   to the Southern District of Iowa for court

22   appearances only, and he's not allowed to have any

23   direct or indirect contact with any witnesses in the

24   case.  I don't know who that would be.  I mean, he's

25   not going to have any contact with the Governor of

 1    Iowa.  I'm sure they will make sure of that.

 2              And then if he's able to contribute toward

 3    the cost of the services required by the bond, he

 4    should have to do that, but I don't anticipate he

 5    will be able to do so.  And I do want him on some

 6    kind of electronic monitoring.  What would pretrial

 7    recommend?

 8              UNIDENTIFIED SPEAKER:  Your Honor, I think

 9    given that he is not employed, we would recommend

10    home detention, which is condition number 9 of the

11    special conditions.

12              I would note I am aware of some spotty

13    connection issues in Concrete, but if that condition

14    is imposed, release would be coordinated by our

15    office.  And if there is any issue with the

16    connect -- they will look into it.  If there is any

17    issue with the connectivity, they can let Your Honor

18    know.

19              THE COURT:  So will he be able to get some

20    kind of booster for Wi-Fi or something that would

21    make it work, or is there --

22              UNIDENTIFIED SPEAKER:  I don't believe so.

23    I think just the nature of Concrete --

24              THE COURT:  Where it is.  I guess we'll

25    have to see.

1            THE DEFENDANT:  We --

2            THE COURT:  No, don't add anything else.

3  So can that be done today?

4            UNIDENTIFIED SPEAKER:  I don't believe so.

5  Primarily --

6            THE COURT:  Okay.  No problem.  So do you

7  see any problem with any of those conditions,

8  Mr. Carroll?

9            MR. CARROLL:  We have no objection and

10  appreciate it.  I would just suggest that in terms

11  of location monitoring, the risk is that -- the

12  nightmare risk, which I don't think is really

13  present in this case, is that with him traveling

14  somewhere he's not supposed to be traveling, in

15  which case stand-alone monitoring would be -- would

16  address that issue rather than home confinement.

17  Honestly, I think most of his time is spent on a

18  PlayStation at home, so I don't think it will be a

19  hardship for him either way.

20            THE COURT:  Okay.  And no firearms in the

21  home.  The firearm that was mentioned has to be

22  removed before he gets home.

23            MR. CARROLL:  And I have spoken with his

24  housemate, Aaron, about that.

25            THE COURT:  Okay.  I also was actually

1   going to ask you about the comment that he and his

2   fiancée -- well, someone, Ms. Leeder, I guess, said

3   that the homeowner lost his job recently.

4          MR. CARROLL:  Yes.  Aaron -- so it's him,

5   his fiancée, Megan, and Aaron, the homeowner.  They

6   all live together kind of collectively, and at this

7   point in time, they are -- his disability,

8   Mr. Kelly's disability --

9          THE COURT:  Is what they are relying on.

10         MR. CARROLL:  -- is what they are relying

11   on.

12         THE COURT:  Which, you know, that's their

13   business, but she said they are behind, meaning

14   probably mortgage payment is behind, and if that's

15   true, that may not be an option for him to stay

16   there for some --

17         MR. CARROLL:  Well, I think that would

18   take quite a bit of time to pan out.  It was my

19   understanding during the pretrial services interview

20   that utility payments were what's -- what they are

21   really behind on.

22         THE DEFENDANT:  (Inaudible) for the house,

23   so we're good with that.

24         THE COURT:  Okay.  So is there any

25   question about what the conditions are?  I think we

1   all understand.  And has anyone signed an order of

2   transfer yet?  I don't have one right here.  It was

3   signed because he waived the identity hearing, I

4   take it, so -- okay.  We'll print this out for him

5   to look at.

6            So I would hope a mental health assessment

7   can happen as soon as possible.  Does pretrial think

8   there will be any significant delay in that?

9            UNIDENTIFIED SPEAKER:  It's honestly hard

10  to say, Your Honor, given it doesn't sound like he

11  already has any type of insurance in place and given

12  backups, but we do have the ability to pay for the

13  services, if necessary.  How long that process will

14  take, though --

15           THE COURT:  Right, but if you can

16  prioritize it, I mean, I just think there is a

17  crying need for that here.

18           UNIDENTIFIED SPEAKER:  Yes, Your Honor.

19           THE COURT:  So here you go.  Mr. Kelly,

20  you'll probably have to come back tomorrow.  You'll

21  probably have to stay at FDC tonight because they

22  have to connect the location monitoring equipment,

23  and it's too late in the day to do that.  So you're

24  going to have to go back down, and then you'll come

25  back here today -- tomorrow, I believe.  Is that

1    right?  He'll meet with the location monitoring

2    specialist here in the morning?

3                UNIDENTIFIED SPEAKER:  (Inaudible)

4    location monitoring specialist.  They may also just

5    coordinate it directly from the Federal Detention

6    Center.

7                THE COURT:  They might be able to do it

8    there.  One way or another, you'll see someone

9    tomorrow morning, and they will connect you to the

10   location monitoring system.

11               (Attorney-client conference off the

12   record.)

13               MR. CARROLL:  Your Honor, I have reviewed

14   the bond conditions with Mr. Kelly, and he

15   understands the conditions that the Court is

16   imposing.

17               THE COURT:  Great.  So, Mr. Kelly,

18   understand that your case is proceeding back in

19   Iowa, and we don't have an actual date for your next

20   court hearing.  Stay in touch with Mr. Carroll,

21   because he's going to have to communicate with them

22   and find out what the next date is, but you will

23   have to get back there somehow to make your first

24   appearance, unless there's some other arrangements

25   that can be made.

1               So two people now going forward that you

2    need to stay in very close contact with, one is your

3    lawyer, Mr. Carroll; the other is whoever the

4    pretrial services officer is who is going to be

5    assigned to your case.  So, you know, you need to be

6    really closely in touch with them.

7               THE DEFENDANT:  All right.  Thank you.

8               THE COURT:  You're welcome.  Thank you.

9               (Conclusion of audiotape.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **CERTIFICATE**

2              I, the undersigned, a Certified Shorthand

3      Reporter of the State of Iowa, do hereby certify

4      that the recorded proceedings were transcribed under

5      my direction to the best of my ability.

6              Dated this 4th day of May, 2023.

7

8                          _____
                           Certified Shorthand Reporter
9                          Lee Ann Eaton, Iowa CSR #972

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**1**

18th 5:6

**2**

2016 12:1 17:6
2018 14:16
2020 5:23
2021 6:12
2022 6:21 12:17
24th 5:11 8:3

**3**

3142(f)(2) 11:9, 13
34 10:23 13:21

**9**

9 20:10

**A**

Aaron 10:17 21:24 22:4,5
ability 23:12
able 12:14 19:18 20:2,5,19 24:7
accept 9:12
act 10:22
acted 17:22,25
acting 17:15
action 18:5
actions 18:22
actual 24:19
actually 9:7 10:21 17:21 18:1 21:25
add 21:2
addition 4:9 7:21

address 3:2 4:22 12:23 21:16
addresses 7:7
addressing 19:1
ADHD 14:3,8 16:11
adult 14:25
afford 16:14,18
afternoon 2:2,8, 10,12,14
age 8:19
agents 5:11
Alabama 14:15 15:3
alarming 12:7
allegations 5:4 13:3 18:9
alleged 9:7 14:22 18:21
allegedly 12:12
allow 18:24
allowed 19:22
alluded 4:4
Anacortes 5:24 7:16
analysis 13:5
answer 18:9
anticipate 20:4
anxious 13:10
apparently 8:25
appearance 3:5, 6 24:24
appearances 2:6 5:15 19:22
appears 4:17 17:24
applied 6:15
appreciate 21:10
April 5:6,11 8:3
Arizona 14:20

arrangements 24:24
arrested 5:12
ask 8:24 10:9 13:18 22:1
asked 11:8
asking 6:9 8:7 10:14
assessment 23:6
assigned 25:5
associates 17:21
assume 15:7,25
assure 3:24
attempt 11:17,18 13:7
attorney-client 24:11
audiotape 25:9
autism 14:3,9,10 16:11 17:22
automatically 11:8
award 15:21
aware 20:12
away 14:18

**B**

back 7:6,7 8:7 11:25 14:19 17:5 23:20,24,25 24:18,23
backups 23:12
Bailey 11:3
based 5:15
basis 11:11
beat 5:25
behalf 2:9,13
behavior 8:18 12:7
bipolar 4:14

bit 18:2 19:11 22:18
bold 9:24
bolder 10:6 18:2, 21
bond 3:6 20:3 24:14
booster 20:20
box 11:10
briefly 4:3
builds 17:19
bunch 14:14
burden 11:5
Burlington 6:12 7:16
burn 6:13,17
business 22:13
buy-in 16:19

**C**

call 12:13 19:12
called 6:4,21
calling 18:3
calls 12:12
Carolina 14:20 15:6
Carroll 2:12,13 9:4,5 10:12,13 13:14,25 14:3,9, 13,16 15:9 16:3,7, 20 17:10 19:16 21:8,9,23 22:4,10, 17 24:13,20 25:3
carry 13:7
carrying 10:22
carts 12:11
case 2:5,15,22 5:24 6:19 7:5,16 11:16 13:4,8 18:17,19 19:24 21:13,15 24:18 25:5

cases 17:3
Center 24:6
CEO 6:24 7:1
cetera 9:25
challenges 18:7
change 5:19
characterize 9:11
charge 4:5 17:5
charged 2:17 4:4 12:5 17:9 18:22
charges 3:2 4:22 7:13,18 14:22,23 17:13
checking 11:9
Chicago 6:22
clear 11:15
close 18:14 25:2
closed 7:2
closely 25:6
collecting 13:16
collective 12:25
collectively 22:6
comment 22:1
communicate 12:20 24:21
community 3:23 5:3
company 12:21
compared 7:23
complaint 4:6 5:5
comply 13:1 16:22
concern 4:16,19, 25 8:1,2,16
concerned 17:14
concerns 3:19, 20,25 8:11
conclusion 25:9

**Concrete** 7:8 20:13,23

**condition** 16:23, 25 20:10,13

**conditions** 3:12, 24 4:23 10:14 13:1 16:6,22 18:13,24 20:11 21:7 22:25 24:14, 15

**conducted** 5:12

**conference** 24:11

**confessed** 5:13

**confinement** 21:16

**confining** 18:8

**connect** 20:16 23:22 24:9

**connection** 20:13

**connectivity** 20:17

**contact** 19:23,25 25:2

**continue** 12:14

**contrasted** 7:24

**contribute** 20:2

**controlled** 15:4

**conversation** 14:5

**conviction** 11:25 17:6

**convictions** 14:23

**convincing** 11:15

**coordinate** 24:5

**coordinated** 20:14

**correct** 7:14 17:10

**corroborated** 14:4

**cost** 20:3

**counsel** 5:22

**count** 4:6

**country** 14:15

**coupled** 4:16

**court** 2:2,10,14 4:3 5:4,8 7:10 8:24 9:5,23 10:6, 9,12 12:4 13:2,18 14:1,6,10,14,20 15:13,17,20,24 16:5,9,15,23 17:4, 8,11 19:18,21 20:19,24 21:2,6, 20,25 22:9,12,24 23:15,19 24:7,15, 17,20 25:8

**Court's** 13:5

**COVID** 6:3 12:15

**crime** 11:7

**criminal** 10:24 11:24 17:2

**crying** 23:17

**current** 13:3

**custody** 3:6

**cut** 18:12

**cyber** 6:22,23

___

**D**

**danger** 3:22 5:3 8:16 11:13 19:2

**date** 24:19,22

**dated** 17:5

**day** 23:23

**days** 7:3 10:18

**deep** 4:11

**defendant** 2:11, 18,23 13:9,12 15:12,15,18,22 16:14,17 21:1 22:22 25:7

**defendant's** 6:1

**defense** 5:21

**delay** 23:8

**Dennis** 2:13

**detain** 10:9

**detainable** 19:9

**detained** 3:16

**detention** 3:9 11:7,9,14 19:3 20:10 24:5

**determine** 2:22 3:4

**diagnosed** 15:18

**differ** 3:23

**differently** 8:10

**difficult** 13:11

**direct** 19:23

**directed** 4:7 5:9, 17 8:22 9:10

**directing** 10:3

**directly** 24:5

**disability** 12:19 13:23,24 14:1,7 15:8,10,15,25 16:10 22:7,8

**disabled** 14:8 16:12

**discussing** 7:17

**dismissed** 15:1

**disorder** 4:14

**disposition** 15:3

**district** 2:16,19, 20 3:1,7,17 4:5,21 5:5 10:10 18:17, 18 19:20,21

**doctor** 4:12

**Doordash** 16:3,5

**drug** 19:11,14

**due** 6:3 14:8

___

**E**

**early** 15:19

**easy** 16:9

**economic** 4:24

**elected** 8:23

**electronic** 18:16 20:6

**Elyne** 2:9

**email** 7:5

**employed** 4:18 20:9

**employee** 5:25

**employment** 4:17,23

**enforcement** 6:19

**enough** 19:6,8

**equipment** 23:22

**escalated** 8:19

**escalating** 9:6, 11,15

**escalation** 8:18 9:20,25

**evidence** 11:15 13:8,10

**exactly** 15:9 17:8

**examination** 7:4

**explosion** 17:21

**explosive** 18:4

**extent** 19:17

**extremely** 10:23

___

**F**

**face** 12:3

**facie** 19:7

**fact** 4:16 9:9 11:3 13:9,22

**factor** 13:5

**factors** 10:25

**failure** 15:3

**favor** 11:2

**FBI** 5:11 6:23

**FDC** 23:21

**Federal** 24:5

**felony** 11:24

**fiancée** 12:14 14:17 22:2,5

**file** 3:8

**filed** 2:15 3:10 5:5 6:22 7:13 8:6

**finance** 6:22 12:16,21

**find** 19:6 24:22

**finding** 19:7

**fine** 15:2

**firearm** 8:8,25 21:21

**firearms** 8:5 21:20

**fired** 6:2,6

**first** 3:3 8:25 24:23

**flight** 3:22 4:2 11:10,12

**Florida** 14:21 15:5

**following** 3:18

**forget** 16:1

**format** 11:3

**forthright** 8:13

**forward** 11:5 25:1

**found** 2:25

**four** 12:23

**framing** 11:1

**frankly** 11:11

**frightening** 19:5

___

**G**

**gathering** 12:10

**girlfriend** 6:2,6,7

**good** 2:2,8,10,12, 14 22:23

**Government** 2:9 3:8,19,25 5:1 8:2 11:4,8,14 13:4 17:12

**Government's** 4:19 8:16

**governor** 4:8 5:9, 18 9:10 13:16 18:3 19:25

**governor's** 5:18

**grasp** 13:20

**Great** 24:17

**grocery** 12:11

**guess** 9:2,16,19 20:24 22:2

———

**H**

**happen** 23:7

**happened** 9:13

**hard** 23:9

**hardship** 21:19

**harm** 6:5 8:20

**He'll** 24:1

**health** 4:11,15,23 16:22,24 18:7,14 19:13 23:6

**heard** 7:11 10:5

**hearing** 2:21 3:4 11:7,9,15 23:3 24:20

**heavy** 19:14

**help** 13:1

**helping** 19:19

**high-profile** 18:20

**Higher** 9:23,24

**higher-profile** 10:4

**highest** 8:22

**history** 5:22 7:15, 21 9:8 10:24,25 11:24 17:3,15 18:10

**holds** 17:20

**home** 8:6 14:11, 18 20:10 21:16, 18,21,22

**homeowner** 22:3,5

**honestly** 21:17 23:9

**Honor** 2:8,12 3:14,15,18 4:3 5:20 6:20 7:20 8:12 10:8,13 16:21 20:8,17 23:10,18 24:13

**hope** 23:6

**house** 8:5,9,10 9:1 22:22

**housemate** 12:24 21:24

**However** 13:5

———

**I**

**idea** 12:18

**identity** 23:3

**Illinois** 6:22

**important** 13:5

**imposed** 20:14

**imposes** 16:23

**imposing** 24:16

**impulsive** 18:4

**Inaudible** 22:22 24:3

**incident** 12:2

**incidents** 7:10 9:7 17:12

**indicated** 8:4,7

**indicating** 6:24

**indication** 5:14 13:6 19:14

**indications** 4:10, 13

**indirect** 19:23

**individual** 2:25 9:1

**individuals** 8:21

**initial** 7:24

**initially** 3:10 8:4

**injure** 11:18,19

**insurance** 23:11

**intended** 9:21

**interstate** 4:6

**interview** 7:24 8:8 22:19

**interviewed** 8:4

**intimidate** 11:18, 19

**investigation** 7:4

**involves** 11:16

**Iowa** 2:16,19 3:1, 7,17 4:5,21 5:10 8:23 10:11 13:2, 15 18:3 19:21 20:1 24:19

**IP** 7:7

**issue** 3:23 20:15, 17 21:16

**issues** 4:11,15 14:22 20:13

———

**J**

**jest** 5:15

**job** 6:15,16 12:9 22:3

**jokingly** 5:15

**July** 12:17

**juror** 11:20

**jury** 11:20

**justice** 11:17,25

———

**K**

**Kelly** 2:6,13,15 3:11,16,21 5:2,12, 13,22 6:4 7:6,9 8:3,7,13,17 9:18 10:9,23 12:3,17 23:19 24:14,17

**Kelly's** 22:8

**kind** 7:22 8:15 11:4 12:6,25 13:11 17:19 18:14 20:6,20 22:6

———

**L**

**landscaping** 16:2

**last** 6:21 7:11,17 10:18 11:24 15:16

**late** 23:23

**latest** 9:9

**law** 6:18

**lawyer** 25:3

**least** 13:4 14:22 15:16 19:6

**Leeder** 6:7 22:2

**legislation** 5:19

**level** 19:7

**license** 13:13

**light** 17:4

**limited** 10:24 11:24

**live** 9:2,3 12:25 13:21 22:6

**lived** 14:14

**living** 15:20,22

**locales** 14:24

**location** 7:8,9 21:11 23:22 24:1, 4,10

**lockdown** 12:15

**long** 14:2 23:13

**looked** 7:22

**lost** 22:3

———

**M**

**M1** 6:21 12:16

**made** 5:6,13,14, 25 6:13,16,25 24:25

**make** 4:21 18:13 19:7 20:1,21 24:23

**making** 13:9,15 19:2

**marijuana** 19:15, 17

**mark** 19:12

**meaning** 22:13

**Medicare** 16:16, 17

**meet** 19:3 24:1

**Megan** 6:7 22:5

**mental** 4:11,14, 22 16:22,24 18:7, 14 19:13 23:6

**mentioned** 7:11, 22 17:12 21:21

**met** 11:5

**mind** 5:19

**misses** 19:12

**mitigate** 3:24

**MJ23-189** 2:5

**monitoring** 18:14,16 19:13 20:6 21:11,15 23:22 24:1,4,10

**Montessori** 6:1

**morning** 11:6 24:2,9

**mortgage** 22:14

**mother** 17:20

**Motion** 3:8

moved 14:11

moving 4:25
14:17,18

murder 7:1

_____

**N**

named 2:18,22

nature 13:17
20:23

necessarily 9:20

necessary 23:13

nightmare 21:12

North 14:20 15:5

note 6:6 7:17
10:19 12:4 20:12

noted 6:8,19

number 2:5 6:4
9:19 20:10

_____

**O**

objection 16:25
21:9

obstruct 11:17

obstruction
11:25

offense 2:18 13:3
19:9

office 5:18 6:21
7:1,2 20:15

officer 25:4

official 8:23

one-off 12:8

online 6:23

option 22:15

order 23:1

outlined 4:9

overtly 10:19

owned 9:1

owns 8:6 9:1

**P**

paid 16:15

pan 22:18

parents 10:16
13:20 14:5 15:23
17:18

parents' 14:11,
18

part 8:1 16:17
18:15

partner 12:24

parts 8:9

past 5:23 12:23

pattern 9:14,18
10:2 17:18

patterns 9:17

pay 23:12

payment 22:14

payments 22:20

pending 3:6,16
10:10

pens 2:3

people 6:14 7:1
10:20 25:1

person 2:22 6:6
8:6,18 10:4 11:16
12:3,22 16:11

perspective 5:2

phone 12:12,13

phonetic 6:7

physical 10:20
17:22,25

piece 5:19

place 9:17 11:22
23:11

places 14:15 15:7

plans 13:9,15

Playstation
21:18

point 4:17 8:21

9:13 10:7 19:1
22:7

police 12:1

pose 10:21 19:2

poses 8:17

position 3:13,15,
18 8:10

posture 7:15

potential 19:8

practice 9:18
10:2

present 21:13

presents 3:22
5:3

presumption
11:2

pretrial 3:9,21
4:10 6:8 7:23 8:14
10:15 16:25 20:6
22:19 23:7 25:4

pretty 16:12 17:4
18:20 19:5

previous 18:21

prima 19:6

Primarily 21:5

print 23:4

prioritize 23:16

probation 5:21

problem 21:6,7

procedural 7:15

proceeding
24:18

process 23:13

professional
16:24

profile 9:23,24

prospective
11:19

provided 11:6
12:17

purposes 9:13

**Q**

question 11:4
22:25

questions 13:19

_____

**R**

read 5:4

reasonably 3:24

reasons 3:17
7:19

recall 15:9

received 6:24

receiving 14:7

recent 15:11 17:5

recently 22:3

recommend
20:7,9

recommendatio
n 3:11

recommended
10:15 16:25

record 14:25
24:12

recorded 5:7

referenced 7:12

referred 13:22

release 3:4 10:14
11:3 20:14

released 3:5,11
4:20 6:9 18:12,25
19:10

rely 18:23

relying 22:9,10

remain 3:6,16

removed 21:22

rent 16:18

repeat 5:8

repeated 12:12

report 3:9,10,21
4:10 5:24 6:8
7:12,23

reported 6:18

reports 11:6
12:1,4 14:3

required 20:3

residing 7:9

responses 8:14

restricted 19:20

resulted 17:13

revealed 7:5

reviewed 24:13

risk 3:22 4:2
10:21 11:10,12,
16,21 19:2 21:11,
12

risks 3:25

roommate 10:17

Ryan 2:6

_____

**S**

same 7:8 17:8

scheduled 3:3

scheme 17:3

school 6:1,5 8:21
12:11

search 5:12

searches 7:7

seated 2:3

Security 13:23
16:10,16

send 7:6

separated 8:9

serious 5:17
11:10,16 18:7

seriously 6:18
7:2

services 3:9,21
4:10 6:8 7:23 8:14
10:15 17:1 20:3

UNITED STATES vs RYAN C. KELLY
AUDIO TRANSCRIPTION   04/24/2023                          Index: shared..young

22:19 23:13 25:4

**shared** 3:20 5:21

**show** 11:14

**signed** 23:1,3

**significant** 23:8

**similar** 9:14,17

**simply** 5:18

**situation** 4:24
11:1 13:14,20

**Social** 13:23
16:10,15

**son** 17:20

**sort** 4:22,24,25
5:22 6:11 9:16,21
13:8

**sorts** 9:14

**sound** 23:10

**Southern** 2:18
3:1,7,17 4:5,21
10:10 19:21

**speak** 15:12

**SPEAKER** 20:8,
22 21:4 23:9,18
24:3

**special** 20:11

**specialist** 24:2,4

**specific** 5:19
11:21 17:16 19:5

**specifically** 6:25

**spent** 21:17

**spoken** 21:23

**spotty** 20:12

**stable** 12:22

**stalking-type**
12:7

**stand-alone**
21:15

**standpoint** 4:20

**start** 2:7 5:23

**started** 15:10

**state** 4:8 6:13
8:23 9:10 16:18
18:3

**States** 2:6,7 3:13,
15

**status** 3:4

**stay** 22:15 23:21
24:20 25:2

**stop** 5:20 6:10

**store** 6:14,17
8:21

**strong** 11:2 13:4

**submitted** 7:25

**substances** 15:4

**suffering** 4:13

**suggest** 12:6
16:21 21:10

**super** 13:10

**supervision**
16:23

**supplemental**
7:12 8:5

**supplements**
3:10

**supportive** 10:18
12:24

**supposed** 21:14

**supposedly**
12:13

**system** 24:10

**T**

**talked** 10:16

**Target** 6:14 12:9

**targeting** 9:25

**targets** 9:21

**task** 16:9

**tech** 12:20

**ten** 14:12 15:16

**term** 9:16 10:1

**terms** 11:1,13
21:10

**terrifying** 17:17

**testing** 19:11

**thing** 12:11

**things** 9:14 12:8
15:5 17:3,20

**threat** 4:7 5:25
6:11,13,16,24,25
7:2,6 8:19,20,22
9:22 13:7

**threaten** 11:17,
18

**threatened** 6:5

**threats** 5:6,7,9,
13,14,16,17,22
6:18 7:21 9:9
10:3,5 17:15,16
18:1 19:4

**three** 10:17 16:19

**threshold** 19:3

**time** 4:18 14:13
21:17 22:7,18

**times** 10:17

**tip** 6:22,23

**today** 3:4 4:20
5:16 7:25 8:6 11:5
21:3 23:25

**told** 12:17

**tomorrow** 23:20,
25 24:9

**tonight** 23:21

**totally** 13:19

**touch** 4:3 24:20
25:6

**toward** 20:2

**towards** 5:9 8:15,
22

**transfer** 3:16
10:10 23:2

**transferred** 3:1

**transmission**
4:6

**travel** 13:9 19:20

**traveling** 13:10,
11 21:13,14

**treatment** 16:6,8
18:8,15 19:13

**true** 17:24 22:15

**two** 3:19 5:6 7:3
8:9 25:1

**type** 11:21 23:11

**types** 9:7,8 12:8
14:24

**U**

**Uh-huh** 10:6

**unclear** 4:18

**underlying** 4:14
5:4 7:19

**understand** 23:1
24:18

**understanding**
15:11 16:7 22:19

**understands**
24:15

**unemployment**
12:14

**UNIDENTIFIED**
20:8,22 21:4 23:9,
18 24:3

**United** 2:5,7 3:13,
15

**unknown** 15:2

**unstable** 4:17

**upset** 6:3,16
12:13

**utility** 22:20

**V**

**Vaught** 2:8,9
3:14 7:14 9:16,24
10:8

**verbatim** 5:8

**versus** 2:6

**violence** 10:22

**violent** 10:19
18:10

**W**

**waive** 2:23

**waived** 23:3

**warrant** 5:12

**warranted** 11:8

**Washington** 7:8

**weapons** 13:17

**whatsoever**
18:10

**Wi-fi** 20:20

**wishing** 5:18

**witnesses** 19:23

**wondering** 15:6
16:12

**work** 12:15 20:21

**worked** 6:2

**working** 15:7,25

**Y**

**year** 5:7 6:21 12:2

**years** 9:19 10:23
12:23 13:21 14:12
15:5,16 16:19

**yelled** 12:10

**York** 13:21 15:1,
2,22

**young** 8:19 9:2,3
16:11